IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| In Re:<br><br>WC 4TH AND COLORADO, LP, [1]<br><br>Debtor. | Chapter 11<br><br>Case No. 20-10881 (TMD) |

**COLORADO THIRD STREET, LLC'S
MOTION FOR RELIEF FROM THE AUTOMATIC STAY
PURSUANT TO THE SARE PROVISIONS OF 11 U.S.C. § 362(d)(3)**

> THIS PLEADING REQUESTS RELIEF THAT MAY BE ADVERSE TO YOUR INTERESTS.
>
> IF NO TIMELY RESPONSE IS FILED WITHIN **14** DAYS FROM THE DATE OF SERVICE, THE RELIEF REQUESTED HEREIN MAY BE GRANTED WITHOUT A HEARING BEING HELD.
>
> A TIMELY FILED RESPONSE IS NECESSARY FOR A HEARING TO BE HELD.

Colorado Third Street, LLC ("Colorado Third" or "Lender") files this *Motion for Relief from the Automatic Stay Pursuant to the SARE Provisions of 11 U.S.C. § 362(d)(3)* and would respectfully show as follows:

**PRELIMINARY STATEMENT**

1. This is a single asset real estate ("SARE") bankruptcy involving a 0.338 acre commercial property at 117 West 4th Street in downtown Austin (the "Property"). Colorado Third holds a first lien on the Property as security for a commercial real estate loan (the "Loan") made

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number is: WC 4th and Colorado, LP (1759).

to the Debtor. The Loan matured on December 31, 2019, almost one year ago, and the Debtor has not made any payments during that year.

2. The Debtor filed this chapter 11 case on August 4, 2020 (the "Petition Date"), the same day that Lender was scheduled to foreclose on the Property. The unpaid balance due on the Loan was $8,679,267.32 on the Petition Date. Ninety days after the Petition Date, on November 2, 2020, the Debtor filed its Chapter 11 Plan of Reorganization [Dkt. 115] ("Plan") and its Disclosure Statement [Dkt. 114] ("Disclosure Statement").

3. The Debtor's Plan does not comply with the SARE requirements. The Plan amounts to a vague and speculative "choose your own adventure" plan whereby the Debtor proposes to pay off the Loan through *either* a sale, a refinance, or non-market interest payments followed by a balloon payment. However, no details as to any of these options is provided, and as of this filing, the Debtor has not commenced monthly interest payments to Lender (or even filed a motion to use cash collateral) and has not filed a motion to establish bidding procedures, a motion to retain a real estate sales broker, or a motion to retain a banker to assist with any refinancing. In short, the Plan is a vague placeholder and the Debtor has done nothing in the year since the Loan matured, including during the pendency of these cases, but mow the proverbial grass. This, of course, is what the SARE provisions were designed to prevent. The placeholder Plan does not possess "a reasonable possibility of being confirmed within a reasonable time." Rather, allowing such a Plan to satisfy section 362(d)(3) would entirely moot the SARE provisions of the Bankruptcy Code, as every SARE debtor in every SARE case could file such a vague and noncommittal plan. Consequently section 362(d)(3) mandates that Lender be granted relief from the automatic stay.

## JURISDICTION AND VENUE

4.  The United States Bankruptcy Court for the Western District of Texas, Austin Division (this "Court") has jurisdiction pursuant to 28 U.S.C. § 1334(b). This matter is a core proceeding under § 157(b)(2)(G). Venue is proper under 28 U.S.C. § 1409.

## BACKGROUND

**A. The Property and the Loan Documents**

5.  On March 23, 2015, Debtor executed a Promissory Note (the "Note") evidencing a $9,082,000.00 commercial real estate Loan in favor of Independent Bank, formerly Northstar Bank of Texas (the "Original Lender"). The Loan was memorialized in, among other things, a Loan Agreement (the "Loan Agreement") between the Original Lender and the Debtor. The Loan is further secured by the Property, together with improvements thereon, located at 117 West 4th Street, Austin, Texas. Debtor granted the Original Lender a first priority lien, deed of trust, and security interest against the Property pursuant to that Deed of Trust (with Security Agreement, Assignment of Rents and Leases, and Financing Instrument), dated March 23, 2015 (the "Deed of Trust"). The Deed of Trust was recorded in the real property records of Travis County, Texas (the "Real Property Records") on March 25, 2015, under Instrument Number 2015043592.

6.  Pursuant to a Loan Modification Agreement dated October 11, 2019, the Note fully matured on December 31, 2019. Debtor has failed to pay the full amount due and owing under the Loan and has made no payments on the Loan since December 2019. On January 28, 2020, the Original Lender sent the Debtor, Guarantors,[2] and Debtor's legal counsel a notice of default.

7.  On May 1, 2020, the Original Lender and Colorado Third entered into the Assignment and Assumption of Mortgage and Loan Documents, dated May 1, 2020 (the

---

2 Debtor's Guarantors include Natin ("Nate") Paul, WC 4th and Colorado GP, LLC, and World Class Capital Group, LLC.

"Assignment Agreement"), under which the Original Lender assigned all its rights, title, and interest under the Loan Documents and in connection with the Loan to the Lender, including the Loan Agreement, the Note, the Deed of Trust, and the Guaranty Agreements. In addition, the Original Lender also executed an Allonge (the "Allonge") to the Note in the Lender's favor. The Assignment Agreement was recorded in the Real Property Records on May 8, 2020 under Instrument Number 2020074309. On May 19, 2020, the Lender sent the Debtor, the Guarantors, and the Debtor's counsel a second notice of default and provided an additional 10 days to pay the balance due under the Note. No payments have been made.

**B.     The State Court Proceedings**

8.     On June 3, 2020, with the matured Loan unpaid for six months, the Lender provided the Debtor with the first Notice of Substitute Trustee's Sale of the non-judicial foreclosure sale scheduled for July 7, 2020 and filed a state court proceeding styled *Colorado Third Street, LLC v. WC 4th and Colorado, LP* in the 261st Judicial District of Travis County, Texas (the "State Court Proceeding"). Debtor filed a counterclaim against Lender on July 1, 2020.

9.     On July 6, 2020, the Debtor obtained a temporary restraining order enjoining the July 7, 2020 foreclosure sale. The Lender subsequently submitted a second Notice of Substitute Trustee's Sale on July 14, 2020 for an August 4, 2020 foreclosure sale. The Debtor sought a temporary injunction, which was denied on July 31, and the Lender moved forward with its scheduled foreclosure of the Property.

**C.     The Debtor Files Bankruptcy**

10.    Debtor filed this chapter 11 case the same day the foreclosure was scheduled to proceed. At filing, the unpaid balance due on the Note was $8,679,267.32. The Debtor amended its petition on August 4 [Dkt. Nos. 2, 6], on October 8 [Dkt. 80], and on October 9, 2020 [Dkt. 84]. On August 20, 2020, the Debtor filed its Schedules, Statements, and Summary of Financial

Affairs [Dkt. 17]. On November 2, 2020, the Debtor filed its Chapter 11 Plan of Reorganization [Dkt. 115] and its Disclosure Statement [Dkt. 114].

## RELIEF REQUESTED AND BASIS THEREFOR

11.     The Loan matured almost one year ago and Debtor has made no progress in that year towards resolving its debt to Lender. The Plan is a further attempt to delay and does not stand "a reasonable possibility of being confirmed within a reasonable time." 11 U.S.C. § 362(d)(3). Consequently, Lender seeks relief from the automatic stay pursuant to section 362(d)(3) (the "SARE provisions") to allow Lender to exercise its state law remedies against the Property.

**A.     The Legal Standard For Stay Relief Under § 362(d)(3)**

12.     Courts considering stay relief under § 362(d)(3) must determine (1) whether the Bankruptcy Code's SARE provisions apply to the debtor and (2) whether the criteria set forth by those provisions have been satisfied. *See In re Syed*, 238 B.R. 133, 139-40 (Bankr. N.D. Ill. 1999). Here, the Debtor described its business as Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B)) five times in its Original and Amended Petitions for Chapter 11 Relief [Dkt. 1, 2, 6, 80, 84]. It is undisputed that the SARE provisions apply to this case.

13.     The criteria for SARE stay relief are set out by § 362(d)(3) of the Bankruptcy Code. The section reads as follows:

> (d)     On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under section (a) of this section, such as by terminating, annulling, modifying, or condition such stay …
>
> > (3)     with respect to a stay of an act against single asset real estate … by a creditor whose claim is secured by an interest in such real estate, unless …
> >
> > > (A)     the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

5

> (B) the debtor has commenced monthly payments that –
>
> > (i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and
> >
> > (ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate; ….

11 U.S.C. § 362(d)(3).

14. First, the secured lender must show that it holds a secured claim against the debtor and that its claim is secured by the debtor's real property. *E.g. RYY*, 490 B.R. at 37 ("On a motion under Section 362(d)(3), the creditor bears the initial burden of demonstrating the quantum of its claim and its security interest in the real property."). Here, the Lender qualifies for relief under § 362(d)(3) because it holds a valid, fully perfected, secured claim against the Property. The Lender's claim and security interest are established by the Loan Documents.

15. Second, the debtor must show that, within 90 days of the petition date, it has either (1) filed a plan with "a reasonable possibility of being confirmed within a reasonable time" or (2) began monthly payments to its secured creditor. 11 U.S.C. § 362(d)(3); *See RYYZ, LLC*, 490 B.R. at 37 ("The debtor must establish that a reorganization based on its plan is in prospect."); *In re 231 Fourth Ave. Lyceum, LLC*, 506 B.R. 196, 202 (Bankr. E.D.N.Y. 2014) ("It is the Debtor's burden to prove that the Plan has a reasonable possibility of being confirmed within a reasonable time."). It is undisputed that the Debtor has not begun interest payments to the Lender, and therefore the SARE analysis in this case depends upon the Plan.

16. Courts look to § 1129(a)'s requirements to determine if a plan has a reasonable possibility of being confirmed within a reasonable time. While this inquiry does not require "a mini confirmation hearing," the debtor must show that its plan has "a realistic chance of being confirmed [and] is not patently unconfirmable." *In re RIM Dev., LLC*, 448 B.R. 280, 288–89 (Bankr. D. Kan. 2010) (citations omitted); *see also In re CBBT, L.P.*, 11-30036-H3-11, 2011 WL 1770438, at *3 (Bankr. S.D. Tex. May 9, 2011).

**B. The Debtor's Plan is a Vague Placeholder that Does Not Satisfy the SARE Provisions**

17. The Debtor's Plan lacks any detail as to its feasibility, and consequently it is a mere placeholder plan that does not have "a reasonable possibility of being confirmed within a reasonable time."

18. To withstand the SARE provisions, a plan must describe a viable restructuring that is reasonably capable of being effectuated. Particulars such as a willing buyer or a committed lender are essential: "[the] debtor's hope that market conditions will improve in the future is not enough to establish that its plan has a reasonable prospect of being confirmed when the debtor has no willing lender or buyer." *In re Saddlebrook Subdivision, LLC*, 08-04296-8-JRL, 2008 WL 5146541, at *3 (Bankr. E.D.N.C. Dec. 8, 2008); s*ee also In re Trigee Found., Inc.*, 12-00624, 2013 WL 1401889, at *2 (Bankr. D.D.C. Apr. 8, 2013) (modifying stay when debtor filed plan without disclosure statement and could offer "only a sketchy presentation of how it could proceed to confirmation"). As one court stated:

> While the debtor's plan does not have to be perfect, the plan, together with the evidence and the debtor's arguments, must delineate a credible path to reorganization. Hurdles to plan confirmation must be addressed in a way that provides the court with grounds to conclude (i) it is more likely than not they will be overcome, and (ii), because there is a time element, they can be overcome promptly. Unless the plan has a true prospect of being confirmed within a reasonable time, or timely payments have been made, a secured creditor should not be compelled to endure further delay, expense, and risk.

*RYYZ, LLC*, 490 B.R. at 37.

19. A debtor "cannot establish a reasonable possibility of confirming a plan [under 362(d)(3)] based on the *possibility* of investments or refinancing." *In re 231 Fourth Ave. Lyceum, LLC*, 506 B.R. 196, 204 (Bankr. E.D.N.Y. 2014). Where a debtor "has not provided any evidence that the income and funding, on which the Plan is based, will in fact be obtained" and has "not identified any investor or source of funding that has provided a funding commitment", such debtor fails to satisfy the SARE provisions.

20. In this case, the Debtor proposes to pay the Lender's secured claim using *either* "(a) cash proceeds from leasing [with a balloon payment to be made in August 2021], (b) cash proceeds from refinance, *or* (c) cash proceeds from a sale." Plan § 3.06.1.1 (emphasis added). The source of cash required under the Plan is purported to come from "rental receipts, proceeds of refinance, proceeds of a sale, *or* from Bankruptcy Court-approved financing, including from an affiliate of the Debtor." Plan § 4.05 (emphasis added.). Yet no details are provided as to the proposed refinancing lender, or the amount, rate, timing, or tenor of any refinance. Further, a plan based on an undefined balloon payment is too vague to be feasible. *See In re Geijsel*, 480 B.R. 238, 273 (Bankr. N.D. Tex. 2012) (finding plan not feasible when Debtors faced balloon payment without "specific plan for payment," and requiring debtor to provide some assurance that there will very well be a buyer or refinancier willing to part with enough cash to protect creditor that is entitled to this balloon payment).

21. As for a sale process, the Debtor's Plan suggests that Colorado Third will "receive the net proceeds from the sale of all or a portion of the Property after payment of customary closing costs (including broker's fees, title insurance fees, and other typical closing costs and taxes attributable to the Property)." Plan § 3.06.1.1.2(b). Yet, the Debtor has made no effort to outline

any sale procedures, has not identified a single potential buyer, has not identified a broker who might facilitate such a sale, and has not filed a motion to retain a broker, a sale motion, or a motion to establish bidding procedures.

22. In sum, the Plan offers only a "sketchy presentation of how it could proceed to confirmation[.]" *Trigee*, 12-00624, 2013 WL 1401889, at *2. It is a placeholder filed to further stall foreclosure under a Loan that matured almost one year ago, while the Debtor waits for a white knight. The SARE provisions are designed to prohibit this strategy. Indeed, every debtor in every SARE case could file a plan like the Debtor's Plan—listing exit options of cramdown or refi or sale and providing no specifics—and thereby negate the SARE provisions entirely.[3] Consequently Courts have repeatedly refused to accept placeholder plans under similar circumstances. This Court should likewise refuse to accept the Plan, enforce the SARE provisions, and lift the automatic stay pursuant to 11 U.S.C. § 362(d)(3).

C. **The Plan is Not Confirmable Over the Objection of Colorado Third**

   a. *The Debtor's Plan is Not Fair and Equitable*

23. The Plan does not have a reasonable possibility of achieving confirmation because it cannot be confirmed over the Lender's objection. In order to be confirmed over Lender's objection, the Debtor's Plan must be, among other things, fair and equitable to Lender pursuant to 11 U.S.C. § 1129(b). With respect to secured claims, a plan is fair and equitable if it provides:

> (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
>
> (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property . . . .

---

[3] Note that the Debtor's affiliates are proving this point by filing essentially the same plan in *In re WC 2101 Ben White*, Case No. 10182, and *In re 900 CC*, Case No. 19-10881.

9

11 U.S.C. § 1129(b)(2)(A)(i).

24. The language in section 1129(b)(2)(A)(i) is in the conjunctive form, so both provisions thereunder must be satisfied. This language has commonly been interpreted to require that courts "discount[t] . . . [a] stream of deferred payments back to the[ir] original present dollar value . . . to ensure that a creditor receives at least the value of its claim." *Till v. SCS Credit Corp.*, 541 U.S. 465, 474 (2004) (plurality opinion). A majority of courts, including courts in the Fifth Circuit, employ a two-step approach to determine the appropriate interest rate. *See Matter of MPM Silicones, L.L.C.*, 874 F.3d 787, 800 (2d Cir. 2017) ("We adopt the Sixth Circuit's two-step approach, which, in our view, best aligns with the Code and relevant precedent"); *In re Northwest Timberline Enterprises*, 348 B.R. 412, 432 (Bankr. N.D. Tex. 2006) (applying prime-plus formula after concluding that the evidence was insufficient to establish the existence of an efficient market); *In re LMR, LLC*, 496 B.R. 410, 429 (Bankr. W.D. Tex. 2013) (same).

25. The first step in the approach is to determine whether an "efficient market" exists for the cramdown loan. *See Bank of Montreal v. Official Comm. Of Unsecured Creditors (In re American HomePatient, Inc.)*, 420 F.3d 559, 568 (6th Cir. 2005). If it does, the market interest rate should be applied. *See id.* An "efficient" market exists where the market "offer[s] a loan with a term, size, and collateral comparable to the forced loan contemplated under the cramdown plan." *Matter of MPM Silicones L.L.C.*, 874 F.3d at 800 (citing *In re Texas Grand Prairie Hotel Realty, L.L.C.*, 710 F.3d 324, 337 (5th Cir. 2013)); *see also In re Moultonborough Hotel Grp., LLC*, No. 10-14214, 2012 WL 5464630, at *7 (Bankr. D. N.H. Nov. 8, 2012) ("When deciding whether an efficient market exists, courts look to expert evidence and evidence of actual loan offers.") (internal citations omitted).

10

26. If no market interest rate exists for a proposed cramdown loan, courts following the two-step approach generally determine the appropriate cramdown interest rate by settling the prime interest rate as a floor and upwardly adjusting for various risk factors (the determined rate referred to hereinafter as the "Formula Rate"). *See In re Moultonborough Hotel Grp., LLC*, 2012 WL 5464630, at *6; *LMR*, 496 B.R. at 429-30 ("[U]nder the *Till* plurality's formula method, a bankruptcy court should begin its cramdown rate analysis with the national prime rate—the rate charged by banks to creditworthy commercial borrowers—and then add a supplemental risk adjustment.") (citing *Texas Grand*, 710 F.3d at 332). Moreover, if the Formula Rate "necessitate[s] an "eye-popping" interest rate, then the plan should "probably not be confirmed" because it will not be feasible. *See Till v. SCS Credit Corp.*, 541 U.S. 465, 480-81 (2004) (internal citations omitted).

27. The goal of the two-step approach is to ensure that the creditor receives the fair and equitable value of its secured claim through deferred payments:

> If a Chapter 11 plan proposes a payment rate below the range of prevailing market rates for loans of compatible risk and duration or which does not take into account the actual risk of that loan, confirmation must be denied because the deferred payments will not yield the present value of the claim and, therefore, the plan is not fair and equitable and will not satisfy § 1129(b)(2)(A)(i)(II).

*See In re Bashas' Inc.*, 437 B.R. 874, 919 (Bankr. D. Az. 2010) (internal citation and quotations omitted).

28. Here, the Debtor's plan proposes to pay Lender interest-only payments at 3.25% (the current prime rate) using cash proceeds from leasing with a balloon payment to be made in August 2021 (the "Cramdown Treatment"). Plan, § 3.06.1.1. In no way can the Cramdown Treatment be said to provide Lender with the present value of its secured claim as required by section 1129(b)(2)(A)(i). The Debtor has not and cannot offer any evidence of any efficient market

rate. In fact, if there were a market for Lender's Loan at 3.25%, then Debtor would have proposed concrete refinancing terms with an actual new lender.

29. Absent an efficient market rate, the Court must then turn to the Formula Rate for the Cramdown Treatment and add the appropriate risk factors to the prime rate to determine the appropriate interest rate that ensures that the secured creditor receives a stream of payments under a debtor's proposed plan of reorganization that has a present value at least equal to the creditor's allowed secured claim. *LMR*, 496 B.R. at 430. The appropriate size of the risk adjustment to the prime rate depends on such factors as (a) the circumstances of the bankruptcy estate, (b) the nature of the security, and (c) the duration and feasibility of the reorganization plan. *Id.* Courts following the *Till* approach assess the debtor's default risk on factors including (a) the quality of debtor's management, (b) the commitment of the debtor's owners, (c) the health and future prospects of the debtor's business, (d) the quality of the lender's collateral, and (e) the feasibility and duration of the plan. *Id.* (citing *Texas Grand*, 710 F.3d at 334).

30. As of the date of this pleading, the federal funds prime rate is 3.25%, the same rate offered by Debtor for the Loan under the Plan. In other words, the Debtor has provided ***zero*** risk adjustment in the calculation of its proposed Formula Rate. Given that the Loan has been in default for almost one year with no payments during that time, the Property is leased to commercial tenants who have demonstrated difficulty paying rent during the COVID-19 pandemic, the Debtor is in chapter 11, the Debtor has over twenty affiliate SARE companies that have filed for bankruptcy protection, and the Debtor's ultimate principal, Nate Paul, was raided by the FBI both at home and at work in 2019 and remains an almost daily fixture of accusations in local and national news publications, it is preposterous to suggest that there is no risk premium required in this case. The Cramdown Treatment is nothing more than a Hail Mary to buy further delay while executing an

aimless search for a buyer or refinance party to fund a balloon payment. Nothing in the Cramdown Treatment comes close to satisfying an "efficient market" comparison or *Till* prime-plus standard.

        b.     *The Plan is Not Proposed in Good Faith*

31.    Moreover, the Debtor's Plan was not proposed in good faith. "To be proposed in good faith, a plan must fairly achieve a result consistent with the Code." *In re Block Shim Dev. Co.-Irving*, 939 F.2d 289, 292 (5th Cir. 1991); *see also In re T–H New Orleans Ltd. Partnership*, 116 F.3d 790 (5th Cir.1997) (good faith determination requires considering totality of circumstances and recognizing the purpose of the code is to offer debtors a "fresh start"). A SARE Debtor filing a plan solely "in an attempt to force terms more favorable to Debtor" does not act in good faith. *See CBBT, L.P.*, 2011 WL 1770438, at *3. The Debtor filed this chapter 11 case at the last possible moment to avoid foreclosure, and it filed its Plan at the last possible moment to preserve the stay. The Debtor's plan is patently unconfirmable and represents only a delaying tactic. It was not filed in good faith and cannot satisfy § 1129(a)(3).

## CONCLUSION

WHEREFORE, the Lender respectfully requests that the Court enter the attached proposed order and grant the Lender relief from the stay pursuant to § 362(d)(3).

Respectfully Submitted,

**BRACEWELL LLP**

By: */s/ Jason G. Cohen*
    Jason G. Cohen
    Texas Bar No. 24050435
    Jason.Cohen@bracewell.com
    William A. (Trey) Wood III
    Texas Bar No. 21916050
    Trey.Wood@bracewell.com
    Christopher L. Dodson
    Texas Bar No. 24050519
    Chris.Dodson@bracewell.com
    711 Louisiana, Suite 2300
    Houston, Texas 77002
    Telephone: (713) 223-2300
    Facsimile: (713) 221-1212

**COUNSEL FOR COLORADO THIRD STREET, LLC**

## **CERTIFICATE OF SERVICE**

      I hereby certify that a true and correct copy of the foregoing was served (i) electronically on the parties registered to receive notice through the court's ECF noticing system on November 10, 2020, otherwise by regular U.S. mail, postage prepaid, on the parties listed on the attached Master Service List on November 10, 2020.

                                              */s/ Jason G. Cohen*
                                              Jason G. Cohen

#6253632